# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

Case Nos. 5D2024-1991
5D2024-1994
LT Case Nos. 2023-DP-000048
2023-DP-69

———————————————

J.R., Mother of J.J., J.J., W.G.,
Jr., and K.B., Children,

     Appellant,

     v.

DEPARTMENT OF CHILDREN AND
FAMILIES,

     Appellee.

———————————————

On appeal from the Circuit Court for Hernando County.
Stephen E. Toner, Jr., Judge.

Scott T. Smith and Adam K. Holbrook, of the Law Office of Scott
T. Smith, P.A., Brooksville, for Appellant.

Rachel Batten, of Children's Legal Services, Brooksville, for
Appellee.

Sara Elizabeth Goldfarb, Statewide Director of Appeals, and
Caitlin E. Burke, Senior Attorney, of Statewide Guardian ad
Litem, Appellate Division, Tallahassee, for Statewide Guardian
ad Litem Office.

Edwards, C.J.

Appellant, J.R., Mother of J.J., J.J., W.G. Jr., and K.B., appeals an order terminating her parental rights to her children, pursuant to section 39.806, Florida Statutes (2023), arguing inter alia, that there is no competent substantial evidence in the record that she knew or should have known that her paramour might inflict a severe head injury on W.G., nor is there any evidence that Mother injured the child. We agree and reverse for further proceedings.

To aid in explaining our decision, we provide the following facts. W.G. was nearly two years old at the time he was injured. W.G. was in good health and uninjured until after Mother's paramour gave him a bath, put him to bed, and was thereafter alone in the home with W.G. while Mother made a short trip to a nearby store to purchase cigarettes at her paramour's request. Upon her return from the store, the paramour told Mother that W.G. was asleep, so she did not go immediately in to check on him. She then engaged in a lengthy FaceTime call with her own mother, who related that there was nothing unusual about Mother's behavior during that time.

About an hour after returning from the store, Mother did go in to get W.G. and noticed something seemed very wrong with him: he was very lethargic and one of his eyes did not appear to look right. Mother called her own mother and hysterically described W.G.'s condition. Rather than call 911 as her mother suggested, Mother and her paramour took W.G. directly to the hospital. Mother was described as extremely upset and frantic when she took W.G. inside the emergency department.

The medical personnel determined that W.G had a severe, comminuted skull fracture that was most likely caused intentionally by blunt trauma, such as a blow from a fist or other object, and was not consistent with an accidental injury. The blow to W.G.'s head caused intracranial bleeding and swelling of the brain which necessitated removal of a portion of W.G.'s skull. He

survived and received further treatment. The Department of Children and Families intervened and filed a shelter petition as to W.G. and his siblings, and later filed a petition to terminate Mother's parental rights to her children based on the severe injuries suffered by W.G.

Mother consistently denied injuring W.G. herself, and there was no proof that she had. She testified that she repeatedly asked her paramour what happened, but he denied any knowledge of how the child was injured. The evidence at the adjudicatory hearing revealed that Mother and her paramour had verbal fights or arguments from time to time and that occasionally the paramour, in anger, had struck the wall of their apartment with his fist and once actually punched a hole in the wall.

According to Mother's unrebutted testimony, the paramour had never been physically violent with her before W.G. was injured, and she had never known of him being violent with any of the children. Mother testified that a few days after W.G. was injured and hospitalized, the paramour did become physically abusive with Mother and hit her in the head with such force that she required four staples to close the wound. Mother's testimony on this incident was also unrebutted.

After receiving all the evidence, the trial court entered an order terminating Mother's parental rights as to W.G. and her other children based on egregious conduct that threatened the life, safety, or physical, mental, or emotional health of the children, based upon W.G.'s serious injuries. The trial court concluded that Mother knew or should have known of the paramour's violent propensity, yet failed to protect W.G. from injury.

Section 39.806(1)(f), Florida Statutes (2023), permits termination of a parent's rights if they "had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling." Based on the evidence in the record, there is an absence of clear and convincing proof to support the trial court's conclusion that Mother had the opportunity and capability to prevent W.G.'s injuries resulting from the egregious conduct of the paramour, yet knowingly failed to do so. That conclusion is not supported by competent

3

substantial evidence and thus, under our standard of review, the order terminating Mother's parental rights cannot stand. *Cf. A.H. v. Fla. Dep't of Child. & Fam. Servs.*, 85 So. 3d 1213, 1217 (Fla. 1st DCA 2012) ("The Department did not show, however, that appellant then knew that S.S. had abused the children or that he should have known that she was likely to abuse the children in the future."). Likewise, in *K.R.L. v. Department of Children & Family Services*, 83 So. 3d 936, 940 (Fla. 3d DCA 2012), the Third District reversed the trial court's order terminating the mother's parental rights to her injured child because "DCF failed to show by clear and convincing evidence that the mother caused any of the child's injuries, or knew of the [prior] abuse and failed to protect the child from such."

We cannot accept Appellee's argument that Mother knew or should have known that her paramour presented a danger of harm through egregious conduct as to W.G. or any of her other children based solely on the fact that Mother witnessed him get angry and hit or punch a wall on several occasions. Based on the evidence presented below, we are compelled to reverse the order terminating Mother's parental rights as to all her children, and we remand this matter for further proceedings consistent with this opinion.

REVERSED and REMANDED for further proceedings.

WALLIS, J., concurs.
EISNAUGLE, J., concurs specially with opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

4

Case Nos. 5D2024-1991
5D2024-1994
LT Case Nos. 2023-DP-000048
2023-DP-69

EISNAUGLE, J., concurring specially with opinion.

I agree that we must reverse the order terminating Mother's parental rights to her children. However, I do not join the majority's opinion because, in my view, the only fact relevant to our disposition is that Mother knew her paramour punched the wall on several occasions—once leaving a hole. The GAL's argument that Mother knew her paramour presented a danger to the children because she knew he punched the wall, standing alone, is without merit. *Cf. A.H. v. Fla. Dep't of Child. & Fam. Servs.*, 85 So. 3d 1213, 1217 (Fla. 1st DCA 2012) ("The Department did not show, however, that appellant then knew that S.S. had abused the children or that he should have known that she was likely to abuse the children in the future."). Therefore, I agree with Mother's argument that the order is not supported by competent substantial evidence.